## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| CAROLYN BATES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: 2:13-00051-KD-C |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## ORDER

This matter came before the Court for a non-jury trial on September 30, 2015.  Upon consideration of the parties' arguments and documentary and testimonial evidence presented at trial,[1] the Court makes the following findings of fact and conclusions of law.

## I.    Findings of Fact

On the morning of August 27, 2009, *pro se* Plaintiff Carolyn Bates (Bates) visited the federal courthouse in Selma, Alabama to attend a disability hearing where she was scheduled to serve as a volunteer non-attorney representative of a disability claimant for the child of Bernetta and Marvin Shields (Mr. and Mrs. Shields).  After taking the elevator to the second floor, Bates exited the elevator and walked down the hallway.  Mr. and Mrs. Shields were already present in the second floor hallway at that time.

The second floor hallway of the courthouse contains wooden benches.  These benches have extended seat lips (i.e., the bench seat lip extends several inches out from the bench base and is not flush with the bench base).  These benches are not fastened or secured to the floor.

---

1 Witnesses at trial were Bates, Marvin Shields, and Bernetta Shields for Bates; and Kevin Lear and Frances Davis for the Government.

1

Before the Shields' disability hearing, at approximately 1:30 p.m., Bates decided to sit on a courthouse bench on the second floor hallway. Bates sat down and when she did the bench moved forward and Bates lost her balance. The evidence indicates that the bench either tipped 4-5 inches forward (away from the wall) striking Bates in the neck and then tipped back to the wall, or tipped completely over onto Bates striking her and pinning her to the floor.[2]  Either way, the evidence supports a finding that the bench struck Bates on the back of her right side, hitting her neck, shoulder, back, and hip.  Bates testified that subsequently on her way to the elevator she saw court reporter Frances Davis on the second floor hallway and told her the bench fell on her.

About 20 minutes after the bench struck Bates, she reported the incident to the court officer on duty, Security Guard Bettie Davis (Davis) who prepared an Offense/Incident Report. Davis then reported the incident to Sergeant Ernest Barnes (Barnes) of the Federal Protection Service.  GSA Supervisory Building Manager Kevin Lear ("Lear"), who oversees the operations and maintenance of the Selma courthouse,[3] thereafter received the report.

---

[2]   Three (3) witnesses testified to the circumstances of the bench striking Bates.  First, Bates testified that the bench flipped over when she sat on it and that she fell to the floor with the bench on top of her.  Her testimony is consistent with her prior reports, and her descriptions and testimony match the ER records noting that she was seeking treatment for being struck by the bench that had fallen on her on August 27, 2009.   The court finds Bates credible as to the fact that the bench hit her.

Second, Mr. and Mrs. Shields testified that the bench flipped or toppled over onto Bates and that they assisted in lifting the bench off of her.  However, the Shields could not recall anything else from that date, even though it was their child's disability hearing.  The undersigned finds that their testimony is unreliable.

Third, Court Reporter Frances Davis testified that on one occasion she witnessed Bates sit on a second floor hallway bench that tilted forward, 4-5 inches away from the wall, and then titled back to the wall, causing Bates to lose her balance and drop some papers, but did not see the bench fall over on top of Bates.  The Court does not doubt the veracity of Davis' attempt to recollect the event.  However, the Court questions whether Davis' recall is correct.  This is because Davis had no independent recollection of even when the event she described occurred. And it appears that the first time she was asked to recall the event was five years after it occurred.  Moreover, while Davis' description of the incident at trial appears to minimize the significance of the event, Ms. Davis also testified that she felt the need to, and in fact did, report the incident to the presiding Judge.

[3] Lear had been appointed to the Selma courthouse one (1) month prior to the August 27, 2009 incident.

2

After being struck, Bates waited a bit, thinking she was not seriously injured.  But at approximately 3:45 p.m., Bates went to the emergency room at Vaughan Regional Medical Center because the pain would not go away. (Plf's Ex. C).  The ER notes indicate that Bates was treated for an accident with a chief complaint of traumatic pain related to a bench flipping onto her, and that she was complaining of pain in her neck, right hip and back radiating to her legs. (Id.) On physical exam Bates had muscle spasms, and she was given a hip injection.  (Id.)  She was prescribed pain medication by the ER physician.  (Id.)

On November 25, 2009, Bates wrote to Kevin Lear of GSA, regarding the incident and her injuries and submitted her medical bills for payment totaling $1,543.33.  (Def's Ex. 2).  Bates also put GSA on notice that she was going to seek further treatment.

Following her August 2009 ER visit, Bates did not seek further medical treatment again until December 17, 2009, when she saw Dr. Park.  Dr. Park performed an MRI and CT scan to determine whether Ms. Bates' pain complaints were the result of a compression fracture or disc bulge.  (Plf's Ex. D, p. 9-15).  Dr. Parks determined that there was "no compression fracture identified." (Id. at p. 10).  Also, he found "no significant disc bulge" but did see "multilevel disc desiccation."  (Id.)  Dr. Park further described Ms. Bates problem as "discogenic and facet degenerative changes."  (Id. at 13).  Although not explained by the doctor, degenerative change usually refers to arthritis.  However, the court cannot determine whether the multilevel disc desiccation is the result of the aging process or the bench trauma because Dr. Parks did not express any opinion regarding the origin of the mild disc desiccation.

Thereafter, Bates sought treatment on March 14, 2011, from Dr. Laura Kezar.  Bates opined to Dr. Kezar that her pain was the result of the bench incident in August 2009.  Bates

underwent: 1) a lumbar spine x-ray which showed no malalignment of the lumbar spine; 2) a

C/T/L spine series x-ray which showed only mild degenerative changes; 3) a cervical spine x-ray

which showed osteopenia; and 4) a thoracic spine xray which showed osteopenia and minimal

mid thoracic spondylosis. (Plfs Tr. Ex. P).  Again, there is no indication from Dr. Kezar that Dr.

Kezar determined that any of Bates problems were the result of trauma or specifically the trauma

of August 2009.

Bates continued to seek treatment and each time she relayed to the medical professional

her history of trauma in August 2009 and her belief that this was the cause of her pain.  The

following is a synopsis of her treatment through September 2015:

-March 28, 2011: Dr. Kirksey found Bates had "abnormal study" with chronic lumbar radiculopathy in right extremity and L5/S1 nerve root. (Plf's Tr. Ex. D).

-June 6, 2011, Dr. Kezar of Spine Network Department of Physical Medicine and Rehab diagnosed Bates with chronic low back pain and degenerative disc disease, right buttock and hip pain **multifactorial in origination**, greater trochanteric bursitis/tendonitis **"may be post-traumatic" or from an injection**, osteoporosis and chronic neck pain, nerve damage, and chronic thoracic pain. (Plf's Tr. Ex. C) (emphasis added).

-May 24, 2012,  Dr. Nagi gives Bates a plan for treatment of pain. (Plf's Tr. Ex. D)

-June 18, 2012, Bates sees Dr. Peter Nagi (Nagi).  It was noted that Bates reported that prior to the incident she was independent with all activities and was pain free.[4]

-July 15, 2013, a workplace impairment functional test is preformed. The Report states that "[b]ased upon today's testing, she demonstrates the ability to perform within the sedentary work category." (Plf's Tr. Ex. F). The OT noted that even though Bates may not have been exerting maximal effort, "it is my opinion that even with her maximal effort that she would not exceed the light work classification at this point..." (Id.)

-September 9, 2015: Dr. Kidd clinic notes. Notes her history of chronic right sided back, neck and hand pain since bench fell on her neck in 2009. Bates reported she had a fall

_____

4 The court notes that Ms. Bates testified that she had been totally disabled and received Social Security disability for several years prior to the August 2009 incident.  Although not clear, Ms. Bates testified that this disability determination was based on asthma and pain unrelated to her neck and back.

about 3 months prior and "feels her symptoms were worsened by this fall and have continued to progress since that time." (Plf's Tr. Ex. E/F). He diagnosed her with sacroiliac joint dysfunction, troachaeric bursitis. Sent her for lumbar spine exam related to her recent fall.

-September 2015, UAB Selma Family Medicine Center physician Dr. Laura B. Kezar concluded that Bates' chronic low back pain radiating into the legs identified with an onset of pain after her injury at the courthouse in August 2009 with gradual worsening **"may have been the cause of her pain or this may simply represent normal aging wear and tear changes of the spine with exacerbation related to an acute contusion or sprain."** (Def's Tr. Ex. 11). Dr. Kezar added that Bates' hip bursitis was possibly related to her back pain. (<u>Id</u>.) As for Bates' neck pain, Dr. Kezar noted that this chronic neck pain was suspected as cervical spondylosis and degenerative disk disease although there were no diagnostic studies and that while she had a history of "remote trauma" she had no recent injury. (<u>Id</u>.) As for Bates' nerve damage, Dr. Kezar noted that her 12/17/09 MRI of the thoracic and lumbar spine showed mild disc degeneration and facet arthropathy but "no significant nerve root compression." (<u>Id</u>.) (emphasis added)

Thus, only Dr. Kezar provides any medical support for Bates contention that the trauma of August 2009, is the cause of her pain.   However, Dr. Kezar merely posits that the August 2009 **may** have been the cause or exacerbation of Bates' pain.

At trial, Bates testified that the injuries sustained when the bench fell on her include: "excruciating pain in my neck, my back and my hip" and shoulder, right hip bursitis, and a swollen right foot (Plf's Tr. Ex. C-2 (7/3/2010 photograph)) with sciatic nerve damage causing "excruciating pain" on her rights side from her hip down to her foot from 2009 through the present.  Bates testified that since the August 2009 incident, she takes daily pain medication, has injections three (3) or more times per year, is in continued physical therapy, and has been diagnosed with a bulging disc related to her neck pain, bulging disc related to the lower part of her back with sciatic nerve damage down to the right side of her foot and that her right arm "stopped working" recently.  Bates testified that she has not been released from physical therapy or medical treatment and that she is scheduled for another injection for hip bursitis following

trial.  According to Bates, she can no longer drive due to excruciating pain, clean house (pick up

a clothes basket or stand and wash dishes), or use her hands for a certain length of time, and has

"excruciating pain" in her hands and shoulders.

As explained *infra,* the court does not find Bates' allegations about her level and

continuity of pain to be credible.

II.   **Conclusions of Law**

This case involves a claim of negligence against the United States (the Government).

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from

suit…Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [the United States']

consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  F.D.I.C. v.

Meyer, 510 U.S. 471, 474 (1994).  The United States has consented to be sued via the *Federal*

*Tort Claims Act*, 28 U.S.C. § 1346 *et seq*. as follows:

> Subject to the provisions of chapter 171 of this title [i.e., 28 U.S.C. §§ 2671–2680], the
> district courts...shall have exclusive jurisdiction of civil actions on claims against the
> United States, for money damages, accruing on and after January 1, 1945, for injury or
> loss of property, or personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his office
> or employment, under circumstances where the United States, if a private person, would
> be liable to the claimant in accordance with the law of the place where the act or
> omission occurred.

28 U.S.C. § 1346(b)(1).  As explained in Zelaya v. United States, 781 F.3d 1315 (11th Cir. 2015):

> Translated, any time the federal government is sued based on the act of an employee
> performed within the scope of his employment duties, federal district courts will have
> exclusive jurisdiction of such claims. In addition, § 1346(b)(1) sets, as a predicate, a
> requirement that the circumstances be such that a private person would be liable under
> the law of the state where the federal employee's act or omission occurred, had a private
> person so acted.

Thus, the law of the state in which the suit arises applies – here Alabama.

"In a negligence action asserted under the FTCA, a plaintiff... must show the prima facie elements of duty, breach of duty, causation, and damages."  Perry v. United States, 2012 WL 4340057, *2 (N.D. Ala. Sept. 18, 2012) (citing Sessions v. Nonnenmann, 842 So.2d 649, 651 (Ala. 2002) and DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So.2d 454, 460 (Ala. 2008)).   Specifically in Alabama, to establish negligence, Bates must prove that: 1) the Government owed her a duty of care; 2) the Government breached that duty; 3) Bates suffered a loss or injury; and 4) the Government's negligence was the actual and proximate cause of her injury.  Lollar v. Poe, 622 So.2d 902, 905 (Ala. 1993); Martin v. Arnold, 643 So.2d 564, 567 (Ala. 1994); John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 379 (Ala. 1990).

**A.     Duty of Care**

"[T]his is a premises liability case...[and] '[t]he duty owed by a landowner to an injured party depends upon the status of the injured party in relation to the landowner's land, i.e., is the injured party a trespasser, a licensee, or an invitee." Manning v. Tractor Supply Co., 2015 WL 1578158, *2 (S.D. Ala. Apr. 9, 2015) (quoting Galaxy Cable, Inc. v. Davis, 58 So. 3d 93, 98 (Ala. 2010)).  The Government is the premises owner.  The parties agree, and the undersigned finds, that Bates was an invitee.  At the time of the incident, Bates was actually a business invitee as she was at the courthouse to contribute to a legal proceeding as a non-attorney representative for a claimant during a hearing before the Social Security Administration.   Freeman v. Freeman, 67 So.3d 902, 907-908 (Ala. Civ. App. 2011) ("A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings of the possessor of the land." (citation and internal quotation marks omitted)).

In Alabama, the premises owner owes its invitees a duty to "use reasonable care and diligence to keep the premises in a safe condition or, if the premises [are] in a dangerous condition, to give sufficient warning so that an invitee might avoid danger by the use of ordinary care." Hunter v. Durr Sys., Inc., 2007 WL 1215075, at *2 (M.D. Ala. Apr. 24, 2007). This duty does not extend to "open and obvious" dangers. Id. Additionally, "[t]here is no presumption of negligence which arises from the mere fact of an injury to an invitee[,]"and a premises owner is not an insurer of the safety of its invitees. Ex parte Harold L. Martin Distrib. Co., 769 So.2d 313, 314 (Ala. 2000). See also Giles v. Winn-Dixie Montg., LLC, 574 Fed. Appx. 892, 894 (11th Cir. 2014) (same). The "duty is…'to exercise reasonable care to provide and maintain reasonably safe premises…injured 'plaintiffs must prove that the injury was proximately caused by the negligence of [the premises owner] or one of its servants or employees. Actual or constructive notice of the presence of the…[instrumentality that caused the injury] must be proven before [the premises owner] can be held responsible for the injury.'" Dolgencorp, Inc. v. Hall, 890 So.2d 98, 100 (Ala. 2003) (internal citations omitted). As noted in Edwards v. Intergraph Servs. Co., 4 So.3d 495, 503-504 (Ala. Civ. App. 2008), when an owner "affirmatively created" the defective condition, such as by placing items in an aisle, or when the owner fails to perform reasonable inspections or maintenance of the premises to discover or prevent the defective condition, notice can be inferred.

**B.**     **Breach of Duty of Care**[5]

Bates alleges that the Government breached its duty of care and was negligent by failing

to maintain the courthouse bench in question in a reasonably safe condition.  Specifically, Bates

contends the bench was defective because it was not securely bolted to the floor.

The evidence establishes that the second floor hallway benches, including the bench at

issue, were "part of the premises."   As explained in Mims v. Jack's Restaurant, 565 So.2d 609,

610-611 (Ala. 1990):

> ….in cases where the alleged defect is a part of the premises….once a plaintiff has made
> a prima facie showing that a defect in a part of the premises has caused an injury, then the
> question whether the defendant had actual or constructive notice of the defect will go to
> the jury, regardless of whether plaintiff makes a prima facie showing that the defendant
> had or should have had notice of the defect at the time of the accident. For example, in
> Winn–Dixie Montgomery, Inc. v. Weeks, 504 So. 2d 1210 (Ala. 1987), a mother was
> going through a grocery store pushing a shopping cart, in which her son was sitting. The
> only unusual thing she noticed about the cart was that the wheels made a loud noise and
> were wobbly. While she left the cart for a moment, the child leaned over to reach for
> candy in a display rack, and, as he did so, the cart tilted over and his left cheek was
> impaled on an allegedly broken wire that was sticking up on the display rack. The
> defendants, appealing from a judgment based on a jury verdict in favor of plaintiff,
> argued that there was no evidence that they had constructive notice of the defect. This
> Court affirmed, holding that the question whether the grocery store had constructive
> notice of the alleged defect was for the jury.…
>
> In both this case and in Weeks, the alleged defect or instrumentality was a part of the
> premises. Unlike a spilled substance, a defective threshold or a cart or a display rack is a
> fixture that requires ordinary and reasonable maintenance in order to provide safe
> premises for the store's customers. Because it was the main entrance of the restaurant, we
> find that the question whether [the restaurant] should have known that the threshold was
> defective was a question for the jury.

Subsequently, in Isbell v. Aztecas Mexican Grill, 78 So.3d 420, 423 (Ala. Civ. App. 2011), the

Alabama Court of Civil Appeals followed Mims and concluded that the trier of fact should

---

5 The Government did not argue or present evidence of any purported contributory negligence on Bates'
part, or that the danger of the bench was "open and obvious."  As such, such contentions were not at issue at trial.

determine whether a premises owner had notice of an alleged defect in a booth seat that collapsed. Isbell at 425.  Specifically, that court stated as follows:

> Given our supreme court's holding in *Mims*...we must agree with [Bates] that, because the booth seat that collapsed under him was a fixture or "a part of the premises," the issue whether [the owner] had actual or constructive notice of the alleged defect in the booth seat should "go to the jury, regardless [of the fact that [Bates] failed to make] a prima facie showing that [the owner] had or should have had notice of the defect at the time of the accident."…For that reason, we reverse the summary judgment in favor of [the owner] and remand the cause for further proceedings.

Isbell, 78 So.3d at 425.  Like the restaurant entrance in Mims, the shopping cart in Weeks, and the booth seat in Isbell, the bench at issue in this case "is a fixture that requires ordinary and reasonable maintenance in order to provide [a] safe premises" and no prior notice of the defect to the Government was required. Mims, 565 So.2d at 611.

The court finds that a bench that would, when used for its intended purpose, either readily tilt 4-5 inches away from the wall and strike an individual when sitting on it, or flip over on top of an individual is a defective condition which should not be present in public spaces.  Thus, the Court finds that the Government breached its duty of care to Bates as an invitee because it "affirmatively created" a defective condition at the Selma courthouse or failed to perform reasonable inspections or maintenance of the bench in question to discover or prevent the defective condition. Having found the Government liable for breach of its duty of care to Bates, the Court turns to causation.

## C.   Causation

Bates seeks recovery for the following "bench incident" injuries: right hip bursitis, "excruciating pain in my neck, my back and my hip" and shoulder, and a swollen right foot with sciatic nerve damage causing "excruciating pain" from her hip down to her foot. Throughout

trial, Bates repeatedly testified that she had not suffered from these injuries/ailments before August 27, 2009 or from any problems on the right side of her body, but that since the incident she suffers from such injuries/problems and that her life has changed dramatically as she is in constant pain.  As stated previously, the court does not find Bates' testimony credible as to the extent or continuity of her pain since the August 2009 incident.  First, after her visit to the emergency room on the day of the incident, Bates did not seek treatment again until four months later.  Moreover, at trial her testimony appeared to be an exaggeration of her symptoms and ability to function.

Next, and most importantly, Bates' self-diagnosis of the origins of her pain are not adequately supported by any medical documentation or expert testimony.  "A plaintiff can testify to what his injuries are, so long as his testimony is based on facts and does not present medical conclusions or opinions that require expert testimony."  Marcus v. Lindsey, 592 So.2d 1045, 1046 (Ala. 1992) (citation omitted).  In this case, because of the type of injuries alleged, including bursitis and sciatic nerve damage, expert opinion is required.  The court is unable to determine, based on Bates' testimony alone, whether the need for medical treatment starting in December 2009, was in fact related to the trauma experienced in August 2009.  And in fact, the December 2009 diagnostic conclusion of Dr. Parks would appear to indicate that any pain experienced in December 2009 was the result of the aging process.  Moreover, as stated by Dr. Kezar, in September 2015, Bates' injury at the courthouse in August 2009 "may have been the cause of her pain _or_ this may simply represent normal aging wear and tear changes of the spine with exacerbation related to an acute contusion or sprain."[6]  (Def's Tr. Ex. 11).

---

[6] The court also notes that on September 9, 2015, Bates reported she had fallen about 3 months prior.

Thus, the court finds that while Bates has established that the pain she experienced on the day of the incident was related to the bench incident, she has not established that the trauma in August 2009 is the cause of her complaints thereafter.

**D.**     **Damages**

Based on her testimony and the evidence submitted, the Court finds that Bates is entitled to damages in this case in the amount of **$1,543.33.**  This amount represents the medical bills submitted on November 25, 2009 to GSA, which the court finds to represent Bates' expenses related to her visit to the emergency room in August 2009.

**III.**     **Conclusion**

Based upon the foregoing, it is **ORDERED** that judgment is entered in favor of Bates and against the Government and that Bates is awarded **$1,543.33.**  A Final Judgment shall be entered in conjunction with this Order.

**IV.**     **Costs**

Bates has also requested costs.  This request is ripe after a party has prevailed.  Because Bates is pro se, the court construes her request as a request to tax costs.  As provided in Epling v. United States, 958 F. Supp. 312, 317 (W.D. Ky. 1997):

> [P]ursuant to §2412(a) the prevailing FTCA claimant is left with the waiver of sovereign immunity as to costs under 28 U.S.C. § 1920 that has been a traditional component of § 2412 since its inception. *See generally* 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2672, at 236 (noting that, prior to 1966, § 2412 contained an express provision shifting costs in FTCA actions); *Wax v. United States,* 183 F.Supp. 163, 164 (E.D.N.Y.1960) (quoting the cost-shifting language of 28 U.S.C. § 2412(c)). Plaintiffs' motion in this matter seeks payment of six categories of costs by the government: expert witness costs; deposition costs; travel and lodging costs; telephone, postage and copying costs; trial exhibit costs; and other miscellaneous costs. Whether these litigation expenses are indeed "costs" for purposes of § 1920 is of dispositive importance. If they fall outside the scope of § 1920, federal law mandates that the United States may not be held

accountable because it retains sovereign immunity as to the fees and expenses for claims sounding in tort. 28 U.S.C. § 2412(d)(1)(A); *Campbell,* 835 F.2d at 196. 45 Title 28, United States Code, section 1920 reads in relevant part as follows:

> A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

The court has reviewed Bates submissions and determined that the following may be appropriate for reimbursement under section 1920:

1) Copies of depositions of Bernetta Shields, Marvin Shields, Furlona Davis and Irene McNeil totaling **$620.75.**
2) Clerk fees of **$30.00** for CD of hearing before Judge Cassady.
3) Court Reporter fee of **$111.55** for transcript of pre-trial conference.
4) Witness fee of **$40.00** and mileage from Selma for both Bernetta and Marvin Shields.

The government should file any objections to this initial determination of costs to be taxed on or before **October 23, 2015.**  Any costs taxed will issue by separate order.

**DONE** and **ORDERED** this the **14**[th] day of **October 2015.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**